Below is an opinion of the court.

_____
TRISH M. BROWN
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In Re:<br><br>BLAIR B. WOODFIELD,<br><br>                           Debtor. | Bankruptcy Case<br>No. 18-32028-tmb11 |
| PARLEY PEARCE,<br><br>                           Plaintiff,<br>   v.<br>BLAIR B. WOODFIELD,<br><br>                           Defendant. | Adv. Proc. No. 18-3120-tmb<br><br>OPINION |

This matter came before the court on a motion for summary judgment (the "Motion," ECF No. 16) filed by plaintiff Parley Pearce. In deciding this matter, I have carefully considered the written arguments of both parties, the documentary evidence in the record, and applicable legal authority, both as cited by the parties and as discovered through my own research. In light of my review, I grant the Motion in part and deny it in part, for the reasons set forth herein.

I. Relevant Facts

This is primarily a legal dispute based on a handful of material facts. Mr. Pearce filed a concise statement of facts in support of the Motion (the "CSF," ECF No. 18), as required by Local Bankruptcy Rule 7056-1(c). Although Debtor responded to the Motion, he did not

Page 1 – OPINION

respond to the CSF, as required by Local Bankruptcy Rule 7056-1(b). Accordingly, pursuant to Federal Rule of Civil Procedure 56(e)(2), I deem the facts alleged in Mr. Pearce's CSF to be undisputed.

Notwithstanding Debtor's failure to respond to the CSF, the pleadings filed by both parties indicate that most of the material facts are not subject to serious dispute. Debtor and Mr. Pearce are co-owners of a number of limited liability companies ("LLCs"), including the three at issue in this proceeding: Triple R Holdings, LLC; PB & R, LLC; and PB & SH, LLC (collectively, the "Subject LLCs"). Debtor and Mr. Pearce each own 50% of the membership interests in each of the Subject LLCs. The Subject LLCs are governed by substantially identical operating agreements (the "Operating Agreements," see ECF No. 28, Exhs. A – C).[1]

Debtor filed a voluntary chapter 11 petition on June 8, 2018. Oregon law creates a process of "dissociation" when a LLC member files a bankruptcy petition. Under the Oregon LLC statutes (chapter 63, Oregon Revised Statutes, the "LLC Act"),[2] if a member of a multi-member LLC files a bankruptcy petition, that member ceases to be an LLC member, but retains the "right to receive and retain . . . the distributions, as and when made, and allocations of profits and losses to which the [member] would be entitled." ORS 63.249(3) (applicable via ORS 63.265(2)(a)). Oregon's dissociation provision applies only as a default rule, i.e., LLC members may create a different procedure as part of an operating agreement. ORS 63.265. Consistent with this flexibility, the Operating Agreements depart from the dissociation statute in one respect: instead of retaining the right to participate equally in distributions, a dissociated member is only entitled to payment of a set amount of money. Op. Agmt. § 13.2(b).

---

[1] Despite Debtor's failure to respond to the CSF, the admissibility of the Operating Agreements is established because the parties, at the court's direction, provided copies of the Operating Agreements and stipulated to their authenticity. *See* ECF No. 28.

[2] I hold that the internal affairs of the Subject LLCs are governed by Oregon law. This should be self-evident, but clarification is necessary because the Operating Agreements contain a material drafting error: each agreement contains an incomplete choice of law provision that fails to specify what jurisdiction's law applies. Op. Agmt. § 16.2. Choice-of-law cases overwhelmingly hold that the internal affairs of a corporation are governed by the law of the state of incorporation. Restatement (Second) of Conflict of Laws § 313, cmt. e (1971). I hold that the same rule applies to limited liability companies. *See id.*, ch. 13 introductory note (choice-of-law rules regarding corporations are usually applied to other types of business entities).

Mr. Pearce's complaint contains two claims for relief and the Motion seeks summary judgment on both. First, Mr. Pearce seeks a declaratory judgment that Debtor "ceased to be a member of" the Subject LLCs (in other words, he dissociated) upon the filing of his chapter 11 petition. Motion at 2; Complaint (ECF No. 1) ¶¶ 12-17. Second, he seeks a declaration that "to the extent certain operating agreements are executory, they are rejected." Motion at 2; Compl. ¶¶ 18-21. Mr. Pearce's arguments are grounded in Oregon law, but they find support in some bankruptcy case law. Debtor opposes the Motion, citing the Bankruptcy Code's *ipso facto* provisions and a different line of cases.

## II. Analysis

In their combined eagerness to prevail at the end of the day, the parties' briefing leaps over some foundational concepts that are important for purposes of framing and resolving the ultimate questions. These conceptual building blocks are relevant for several reasons, first among which is the fact that the Bankruptcy Code makes no mention of LLCs, thus their treatment in bankruptcy must be determined in reference to broader, generally applicable, concepts. Accordingly, I will begin with a general discussion of LLCs before proceeding to the specific matters argued by the parties.

A.  The Limited Liability Company

Despite their current popularity, LLCs are a fairly recent invention. When the Bankruptcy Code was enacted in 1978, only one state (Wyoming) recognized the LLC form of entity. Mark A. Sargent & Walter D. Schwidetzky, *Limited Liability Company Handbook* § 1:2 (rev. 2018). LLCs went on to became prevalent in business circles when the Internal Revenue Service clarified their tax treatment in 1998. *Id.* Currently, LLCs are a ubiquitous form of entity for businesses large and small. While many states have adopted the Uniform Limited Liability Company Act or the Revised Uniform Limited Liability Company Act, Oregon has not. Oregon's LLC Act was passed in 1993, before the uniform acts had been promulgated. 1 *Advising Oregon Businesses* § 7.1-2 (2017). Despite Oregon's somewhat unique statute, the general principles governing Oregon LLCs are the same as in most other states, including definitional concepts related to a member's interest.

To use an analogy familiar to most lawyers, an LLC membership interest is like a bundle of sticks[3]—a member has various rights and obligations, most of which are governed by default statutory rules that can be varied by the terms of an operating agreement. The rights that comprise LLC membership can generally be sorted into two categories: economic rights and governance rights. 1 Larry E. Ribstein & Robert R. Keatinge *Limited Liability Companies* § 7:3 (rev. 2018). Economic rights include the right to share in the company's profits and losses, and to receive distributions. Governance rights include the right to vote on certain matters and the right to either manage the company's business (in the case of a member-managed LLC) or choose a manager (in the case of a manager-managed LLC).

Consistent with this generally accepted framework, the Oregon LLC Act addresses governance rights of members in sections 63.130 through 63.170; while economic rights are codified in sections 63.175 through 63.235. As mentioned previously, both the LLC Act and the Operating Agreements limit Debtor's governance and economic rights as a consequence of his bankruptcy petition. In bankruptcy, state law (including the common law of contracts) is used to determine a debtor's interest in property. *Dunkley v. Rega Properties (In re Rega Properties)*, 894 F.2d 1136, 1139 (9th Cir. 1990) ("Property interests are created and defined by state law." (*quoting Butner v. U.S.*, 440 U.S. 48, 55 (1979) (internal quotation marks omitted)). Yet, even though state law is the "starting point," bankruptcy courts can and must "supersede state law where it conflicts with the federal bankruptcy law which the court is primarily bound to enforce." *Id.* (*quoting Ohio v. Collins (In re Madeline Marie Nursing Homes)*, 694 F.2d 433, 436-437 (6th Cir. 1982) (citation and internal quotation marks omitted)). Thus, in this case, the provisions of the LLC Act and the Operating Agreements are enforceable unless they are preempted by the Bankruptcy Code. Because economic and governance rights are subject to different statutory and contractual provisions, I will consider them separately.

---

[3] *See* Anna di Robilant, *Property: A Bundle of Sticks or a Tree?* 66 Vanderbilt L. Rev. 869, 878 (2013) ("As capitalism bloomed [in 20th century America], wealth became increasingly dephysicalized. The country underwent successive depressions, and wealth and power became increasingly concentrated. The bundle of sticks concept seemed to better account for these developments. It reflected the dephysicalization, and it allowed greater flexibility in regulating property." (citations omitted)).

Page 4 – OPINION

B. <u>Economic Rights</u>

As previously alluded to, the Operating Agreements specify that one consequence of dissociation is a member loses the right to receive regular distributions, and instead is entitled to receive payment of his capital-account balance over four years. Op. Agmt. § 13.2(b). Debtor argues that the dissociation provisions are overridden by two Code provisions that invalidate certain *ipso facto* clauses.[4] First, § 541(c)(1) overrides *ipso facto* clauses "in an agreement, transfer instrument, or applicable nonbankruptcy law." Second, § 365(e) invalidates *ipso facto* clauses in executory contracts.[5]

By its own terms, § 541(c)(1) applies when property becomes property of the estate by operation of § 541(a)(1), (2), or (5). Here, Debtor's interests in the Subject LLCs are assets of the estate because they are personal property in which the Debtor held a legal interest as of the filing of the petition. *See* ORS 63.239 (LLC membership interests are personal property). Accordingly, the interest came into the estate via § 541(a)(1), and § 541's *ipso facto* provision is therefore triggered. That provision states "an interest of the debtor in property becomes property of the estate . . . notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law . . . that is conditioned on the insolvency or financial condition of the debtor, [or] on the commencement of a case under this title . . . and that effects . . . a forfeiture, modification, or termination of the debtor's interest in property." 11 U.S.C. § 541(c)(1)(B).

It seems self-evident that the dissociation provision in the Operating Agreements effects a modification of the Debtor's interest in the Subject LLCs by ending his right to participate equally in distributions. *See Movitz v. Fiesta Investments (In re Ehmann)*, 319 B.R. 200, 206 (Bankr. D. Ariz. 2005) ("Code § 541(c)(1) renders [LLC dissociation provisions] inapplicable. This necessarily implies the Trustee has all of the rights and powers with respect to [debtor's

---

[4] "Ipso facto" is Latin for "by the fact itself." An *ipso facto* clause is a term of art for a "contract clause that specifies the consequences of a party's bankruptcy." Black's Law Dict. at 957 (10th ed. 2014). The Code's *ipso facto* provisions variously apply to both contractual and statutory *ipso facto* clauses.

[5] The Code includes a third *ipso facto* provision, in § 363(*l*), however the parties have not cited it, and I do not believe this provision is relevant to this proceeding at this time.

Page 5 – OPINION

LLC] that the Debtor held as of the commencement of the case."). Moreover, the dissociation process is conditioned on Debtor's commencement of a bankruptcy case, the precise situation that § 541(c) is intended to address.

Mr. Pearce cites only one case for the proposition that § 541(c)(1) does not apply. Quoting *California v. Farmers Markets (In re Farmers Markets)*, 792 F.2d 1400 (9th Cir. 1986), Pearce asserts that "Section 541(c)(1) applies to avoid 'only those restrictions which prevent *transfer of the debtor's property to the estate*.'" Pltf. Mem. ISO Motion (ECF No. 17) at 6 (quoting 792 F.2d at 1402) (emphasis by Mr. Pearce)). This reading is too narrow. To begin, the dissociation provisions arguably do restrict the transfer of property: part of Debtor's property interest is his right to receive ongoing distributions and exercise governance rights, yet the dissociation provisions purport to prevent those rights from being transferred to Debtor's bankruptcy estate. More to the point, the *Farmers Markets* opinion only refers to § 541(c)(1)(A), when the more salient provision is likely § 541(c)(1)(B). As noted above, § 541(c)(1)(B) speaks more broadly of preventing forfeiture, modification, or termination of a property right. I believe that the dissociation provision of the Operating Agreements would modify Debtor's economic rights; therefore, I hold that this aspect of the dissociation provision is preempted by § 541(c)(1) and Debtor has not lost his economic rights by virtue of filing a chapter 11 petition. Because Pearce's argument fails under § 541(c)(1), I need not consider Debtor's alternate arguments regarding § 365(e).

C.  Governance Rights

Mr. Pearce's Motion is not limited to a determination of Debtor's economic rights. Indeed, Pearce seeks a ruling that Debtor "ceased to have any right to participate in the management or affairs of [the Subject LLCs]." Motion at 2. Mr. Pearce's framing of this issue blurs the distinction between general governance and voting rights, versus the right to actually manage the companies' day-to-day business activities. Because these two subsets of rights implicate different legal issues, I will consider them in turn.

1. General Governance and Voting Rights

The Operating Agreements and the LLC Act grant LLC members the right to vote on certain governance matters. To the extent Pearce is arguing that Debtor lost his ability to vote on such questions, this argument is rejected for the reasons set forth in the previous section—Debtor's rights as an LLC member cannot be terminated or modified solely as a result of his bankruptcy petition. Any provision of the Operating Agreements or the LLC Act that purports to vitiate Debtor's voting rights is unenforceable in bankruptcy under § 541(c)(1).

2. Management Rights

Debtor's right to participate in the management of the Subject LLCs requires a separate analysis because under the LLC Act, the nature of a member's management rights depends on whether an LLC is member-managed or manager-managed. When the court asked the parties to specify the Subject LLCs' management structures, Debtor and Mr. Pearce responded that the articles of organization designate the entities as manager-managed, but that the Operating Agreements are ambiguous and "open to interpretation." Stipulation (ECF No. 28) ¶¶ 2-3. I disagree that there is any ambiguity, because the contents of the Operating Agreements do not control. The LLC Act defines a manager-managed LLC as an LLC "that is designated as a manager-managed limited liability company in the limited liability company's articles of organization." ORS 63.001(20). In contrast, a member-managed LLC is defined as an LLC "other than a manager-managed limited liability company." ORS 63.001(22). I agree with the parties that the Subject LLCs' articles of organization designate all three entities as manager-managed. *See* Stipulation, Exh. D. Under the LLC Act, this designation is dispositive, notwithstanding any contrary language in the Operating Agreements.

The management structure is relevant because it determines the source of Debtor's management rights. In a member-managed LLC, all members have equal management rights, absent a contrary provision in the operating agreement. ORS 63.130(1)(a). In contrast, in a manager-managed LLC—such as the Subject LLCs—members have no management rights other

than to vote on the selection of the manager(s).[6] ORS 63.130(2). A manager of a manager-managed LLC "[m]ust be designated, appointed, [or] elected . . . by a vote, approval or consent of a majority of the members." ORS 63.130(2)(c)(A). Thus, a manager may be appointed through an agreement that constitutes an executory contract (thus implicating the *ipso facto* provision of § 365(e)); or, a manager could be appointed via some other process that does not involve an executory contract.

I must deny Pearce's request for a declaration that Debtor no longer occupies the office of manager, although I do so without prejudice to Pearce renewing this argument later. At the moment, I cannot rule on the question because the record contains no evidence indicating how Debtor came to be a manager of the Subject LLCs. Debtor may have been appointed manager by the Operating Agreements, or the Operating Agreements may simply memorialize the fact that Debtor was appointed pursuant to some other process—the record is silent on this question of fact. Without knowing the authority for his appointment, the court cannot opine on whether Debtor's appointment is modified in some way under § 365 or another provision of the Bankruptcy Code.

D.  Executory Contract Issues

Mr. Pearce also seeks a ruling that "to the extent the Operating Agreements . . . are executory, they are rejected." Motion at 2. This request is easily denied. In a chapter 11 case, a debtor-in-possession may assume or reject an executory contract "at any time before the confirmation of a plan." 11 U.S.C. § 365(d)(2). No plan has yet been confirmed in this case, and Pearce points to no action that constitutes Debtor's rejection of the Operating Agreements; therefore, the Operating Agreements have not been rejected.

The parties overlooked this simple answer, instead jumping headlong into exuberant arguments about whether the Operating Agreements are executory contracts. This classification is significant because only executory contracts can be assumed or rejected under § 365. Mr. Pearce's briefing takes the position that Debtor is unable to assume the Operating Agreements as

---

[6] Of course it is not uncommon for a member of a manager-managed LLC to also be a manager, which is the case here. Nonetheless, the member *in his capacity as a member* has no management rights other than voting on a manager.
Page 8 – OPINION

a matter of law. Pltf. Mem. at 7-9. Meanwhile, Debtor has filed a chapter 11 plan that proposes to assume those very same agreements. Ch. 11 Plan Dated April 4, 2019 (Main Case, ECF No. 75), at 10. Clearly the parties have an actual disagreement over whether the Operating Agreements are executory and this dispute will come to a head during the confirmation process. Therefore, a declaratory ruling under 28 U.S.C. § 2201 is appropriate. *See Societe de Conditionnement en Aluminum v. Hunter Engineering*, 655 F.2d 938, 943 (9th Cir. 1981) (Declaratory judgment is appropriate where controversy is "definite and concrete, touching the legal relations of parties having adverse legal interests. . . . It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." (*quoting Aetna Life Ins. v. Haworth*, 300 U.S. 227, 240-241 (1937) (omission in original)).

To address the questions concerning § 365, I must analyze two discrete issues: (1) are the Operating Agreements executory contracts, and (2) if they are, are they the type of contracts described in § 365(c)(1)(A).

1. Are the Operating Agreements Executory Contracts?

The Bankruptcy Code does not define an executory contract, but most courts adhere to the definition formulated by Professor Vern Countryman, which was referenced with approval in the legislative history of the Bankruptcy Code. *See* 3 Richard Levin & Henry J. Sommer, *Collier on Bankruptcy* [hereinafter "Collier"] ¶ 365.02[2][a], at 365-16, n.10 (16th ed. rev. 2019) (Defining an executory contract as "[a] contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." (*quoting* Vern Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 Minn. L.Rev. 439, 446 (1973)). The Ninth Circuit Court of Appeals has effectively adopted the same standard, holding that "[a] contract is executory, and therefore assumable under § 365, only if one party's failure to perform its obligation would excuse the other party's performance." *Zurich Am. Ins. Co. v. Int'l Fibercom (In re Int'l Fibercom)*, 503 F.3d 933, 941 (9th Cir. 2007).

Page 9 – OPINION

Given this definition, there are two constituent questions I must answer to determine whether the Operating Agreements are executory: are there unperformed obligations, and would a breach excuse performance by the counterparty. Addressing the issue of obligations first, I must look for unperformed obligations on both sides of the contract as of the petition date. *Agarwal v. Pomona Valley Med. Grp. (In re Pomona Valley Med. Grp.)*, 476 F.3d 665, 669, n.4 (9th Cir. 2007). On the one hand, numerous courts have found partnership agreements to be executory contracts. *See, e.g.*, *Samson v. Prokopf (In re Smith)*, 185 B.R. 285, 293, n.10 (Bankr. S.D. Ill. 1995) (collecting cases). On the other hand, LLCs are different creatures, and some LLCs adopt operating agreements that do not actually impose obligations on members, but instead merely provide a structure under which the company is managed. *See In re Garrison-Ashburn, L.C.*, 253 B.R. 700, 708 (Bankr. E.D. Va. 2000). Thus, the question of whether the Operating Agreements are executory can only be resolved by a careful reading of the agreements' actual text.[7] After reviewing the Operating Agreements, I do find that there are several ongoing obligations, which are similar to operating- or partnership-agreement provisions that other courts have held to be executory. Specifically:

- <u>Authorization of company actions</u>. Under § 2.7(c) the members are obligated to hold meetings or otherwise authorize company actions and observe required formalities. *See In re Strata Title*, 2013 WL 1773619, at *2 (Bankr. D. Ariz. Apr. 25, 2013) (voting on certain matters); *Norberg v. Hawks Prairie Casino (In re McSwain)*, 2011 WL 4706982, at *6 (Bankr. W.D. Wash. Oct. 6, 2011) (voting on major decisions and capital requirements).

---

[7] The introductory paragraph of the Operating Agreements states that the contract is between the Debtor, Mr. Pearce, *and* the Subject LLCs. I am skeptical about whether the LLCs are actually party to these agreements, since the detailed provision explaining the effect of the Operating Agreement states that it is an agreement between the members, with no mention of the company. Op. Agmt. § 2.3. Additionally, there are signature lines for the members, but not for the company. *Id.* at p.26. Even assuming, for the sake of argument, that the Subject LLCs are parties to the Operating Agreements, the companies are clearly subject to ongoing obligations, such as maintaining separate identities (§ 2.7), reimbursing members' out-of-pocket expenses (§ 5.3), and indemnifying members for business-related losses (§ 5.5).

Page 10 – OPINION

- Management of company business. Members are required to manage the business and affairs of the company (§ 5.1), to devote such time to this work as may be required (§ 5.4), and to keep specified books and records (§ 10.5). *See Allentown Ambassadors v. Northeast Am. Baseball (In re Allentown Ambassadors)*, 361 B.R. 422, 444 (Bankr. E.D. Pa. 2007) (duty to manage the LLC); *In re Garrison-Ashburn*, 253 B.R. at 708-709 (operating agreement is not executory because members are *not* obligated "to participate in management"); *In re Daugherty Constr.*, 188 B.R. 607, 612 (Bankr. D. Neb. 1995) (continuing obligation to participate in management); *Burley v. Am. Gas & Oil Investors (In re Heafitz)*, 85 B.R. 274, 283-284 (Bankr. S.D.N.Y. 1988) (partner's duty to furnish financial statements, prepare quarterly reports, and keep partnership books and records).

- Obligation to remain a member. Under § 5.10, members may not resign or withdraw from the company except as allowed under the Operating Agreement. *See In re Garrison-Ashburn*, 253 B.R. at 709 (operating agreement is not executory because members "may resign at any time by giving written notice").

- Capital contributions. Members must make additional capital contributions as required. *See In re Allentown Ambassadors*, 361 B.R. at 444 (duty to make additional contributions if needed); *In re Daugherty Constr.*, 188 B.R. at 612 (requirement to make capital contributions in the event of loss); *In re Priestley*, 93 B.R. 253, 258 (Bankr. D.N.M. 1988) (limited partners' obligations to make capital contributions).

- Restrictions on transfer. Members may not assign or sell their membership interest except as allowed under the Operating Agreement (§ 11.1), which grants the LLC and the other member rights of first refusal (§ 11.2). A member who disobeys the transfer restrictions must indemnify the company against resulting damages (§ 11.2(d)). *See In re McSwain*, 2011 WL 4706982, at *6 (affirmative restraint from transferring interest or voluntarily withdrawing); *In re Heafitz*, 85 B.R. at 277 (prohibition on partner withdraw without consent); *but see Samson v. Prokopf (In re Smith)*, 185 B.R. 285, 294 (Bankr. S.D. Ill. 1995) (buyback provision in partnership agreement "does not create a

performance obligation but merely constrains the manner by which a partner may liquidate his or her holdings").

- I also note that the Operating Agreements contain additional obligations that appear to be unperformed, including the duty to indemnify a dissociated member (§ 13.2(b)(ii)), and the duties to wind down the business of the company and notify the Secretary of State in the event of dissolution (§§ 14.4 and 14.6).

Given the provisions above, I find that the Operating Agreements impose obligations on both parties, which obligations were unperformed as of the petition date. The next question is whether the breach of such obligations would be material, such that the non-breaching party would be excused from performance. This is a much more difficult question. When determining whether a contract is executory, the question of materiality is governed by applicable state law. *Hall v. Perry (In re Cochise College Park)*, 703 F.2d 1339, 1348, n.4 (9th Cir. 1983) ("Although whether a given contract is 'executory' under the Bankruptcy Act is an issue of federal law . . . the question of the legal consequences of one party's failure to perform its remaining obligations under a contract is an issue of state contract law.").

Oregon courts follow the general common-law principles regarding materiality of a breach. In *Weaver v. Williams*, 211 Or. 668, 677-678 (1957), the supreme court endorsed the six-factor test from the Restatement of Contracts § 275 (1932) to determine whether a breach is material. That test has been slightly modified and updated in § 241 of the Restatement (Second) of Contracts (1981), which in turn has been utilized by the Oregon Court of Appeals. *Venture Properties v. Parker*, 223 Or. App. 321, 353-354 (2008). As the drafters of the Restatement acknowledge, the factors are somewhat open-ended, because the standard "is necessarily imprecise and flexible." Restatement (Second) of Contracts § 241, cmt. a. The current test, from the Restatement (Second) asks: (1) whether the injured party will be deprived of the anticipated benefits under the contract, (2) whether the injured party can be adequately compensated, (3) whether the breaching party will suffer forfeiture, (4) whether the breaching party will cure the breach, and (5) whether the breaching party has comported with the standards of good faith and fair dealing. *Id.* § 241.

Page 12 – OPINION

The ultimate point of the materiality inquiry is to determine whether the breaching party's actions are such as to foreclose further performance by the counterparties. *Weaver*, 211 Or. at 679. In the context of this proceeding, a determination of materiality requires anticipating the potential results of a hypothetical breach, which can be a challenging exercise. I find it helpful to compare the facts of the present case to a clearly distinguishable hypothetical: suppose there is an LLC with an operating agreement substantially identical to those at issue here, but this LLC has twenty members, each of whom hold a 5% interest. If one of the 5% members failed to discharge her obligations under the operating agreement (say, by not making additional capital contributions), would that breach allow the LLC and the other members to not perform their obligations under the operating agreement? I think the answer is almost certainly negative.[8] Contrast that with the facts of this case, where Debtor and Mr. Pearce are the only members of the Subject LLCs, but neither holds a controlling interest. Here, if either LLC member willfully refused to perform his obligations, the non-breaching member would lack any effective internal enforcement mechanism because the breaching member holds veto power over any proposed corporate action. In such a scenario, the non-breaching member's only apparent remedy would be judicial dissolution under ORS 63.661(b). Judicial dissolution would necessarily entail terminating the existence of the LLCs, a process that would vitiate the Operating Agreements and thereby excuse members from continued performance of their obligations.

Given the particular facts of this case, I hold that a breach of any of the ongoing obligations in the Operating Agreements would be material, thus making the agreements executory contracts for purposes of § 365. The next question, discussed in the following section, is whether the Operating Agreements fall within the scope of § 365(c)(1).

---

[8] This hypothetical only looks at the narrow question of materiality and I do not mean to suggest that the hypothetical 5% member could flaunt her contractual obligations without consequence. *See* Restatement (Second) of Contracts § 241, cmt. a ("Even if not material, the failure may be a breach and give rise to a claim for damages for partial breach.").

Page 13 – OPINION

2. <u>Is Debtor's Ability to Assume the Operating Agreements Restricted under § 365(c)?</u>

Previously in this opinion, I resolved the dispute over Mr. Pearce's first claim by applying § 541(c), thereby avoiding the need to analyze the *ipso facto* provision of § 365(e). The parties' dispute over Pearce's second claim implicates a different subsection of § 365, namely § 365(c), which enforces certain restrictions on assignment.[9] The Ninth Circuit employs the so-called "hypothetical test" governing the assumption of executory contracts. *Perlman v. Catapult Entertainment (In re Catapult Entertainment)*, 165 F.3d 747, 749-750 (9th Cir. 1999). The *Catapult* court adopted a strict literal reading of the statutory text, interpreting § 365(c)(1) as follows: "where applicable nonbankruptcy law makes an executory contract nonassignable because the identity of the nondebtor party is material, a debtor in possession *may not assume* the contract absent consent of the nondebtor party." *Id.* 754-755 (emphasis added).

Mr. Pearce argues that the Debtor's duties under the Operating Agreements "are in the nature of contracts for personal services," and therefore he would not be able to assign his duties. Pltf. Mem. at 8. Debtor urges the court to reject this claim, arguing that further evidence is necessary to determine what services he actually renders to the Subject LLCs. Debtor's Resp. to Motion (ECF No. 23) at 5-8. I do not believe that fact-finding is necessary. As the Ninth Circuit noted in *Catapult Entertainment*, the inquiry is a hypothetical one—regardless of actual facts, *would* the debtor be able to assign the contract in a theoretical scenario? *See also* 3 Collier ¶ 365.07 ("A number of bankruptcy courts concluded that section 365(c) only applies to 'nondelegable contracts such as personal service contracts.' But the circuit courts have concluded that section 365(c) applies more broadly 'to contracts that are not assignable under nonbankruptcy law.'" (citations omitted)).

---

[9] To fully appreciate § 365(c), one must begin with § 365(f), which allows a debtor-in-possession to assign an executory contract notwithstanding a contractual prohibition on assignment. Section 365(c) then narrows the applicability of § 365(f), by allowing the enforcement of certain restrictions under nonbankruptcy law. *See In re Quantegy, Inc.*, 326 B.R. 467, 470 (Bankr. M.D. Ala. 2005) ("At first glance, sections 365(c)(1) and (f)(1) may appear to be at odds because section 365(f)(1) allows assignment irrespective of 'applicable law' while 365(c)(1) restricts both assumption and assignment based on 'applicable law.' In other words, section 365(f)(1) 'giveth' and section 365(c)(1) 'taketh away.'").

Page 14 – OPINION

On the one hand, the LLC Act provides that a "membership interest is assignable in whole or in part." ORS 63.249(1). At first glance, this appears to support Debtor's position. However, a close reading of § 365(c)(1) reveals that the statute itself does not speak of assignment or assignability. Rather, the statute refers to "applicable law [that] excuses a party . . . from accepting performance from . . . an entity other than the debtor." 11 U.S.C. § 365(c)(1)(A). Given this phrasing, the provisions of the LLC Act seem to fit squarely within the scope of § 365(c): while the LLC Act allows assignment, it provides that the assignee does not become a member of the LLC unless and until the assignee is accepted as such. ORS 63.249(3). In this respect, the LLC Act does excuse counterparties from accepting performance from an assignee other than the debtor—while the LLC must render limited performance to the assignee (e.g., the assignee is entitled to receive distributions on the same terms as other interest-holders), it need not accept an assignee's performance (e.g., in the form of services rendered or votes on governance matters). Notably, this restrictive provision is facially neutral insofar as it operates whether the assignment is made because of the assignee's insolvency or for some other reason.[10] Accordingly, because the LLC Act allows LLCs and non-assigning members to insulate themselves from accepting performance from an assignee, I hold that the Debtor may not assign his interest in the Operating Agreements, absent the consent of the counterparty.[11]

### III. Disposition of the Motion

Having decided the legal issues presented, I now must determine how to dispose of the Motion. Ordinarily I would do this by entering an order granting or denying summary judgment. But in this case, Debtor has not consented to entry of a final order by this court, stating that

---

[10] Thanks to § 541(c), this provision of the LLC Act was superseded when the LLC interests came into Debtor's estate. But § 541(c) speaks only of what happens when property "becomes property of the estate;" it does not address the mechanics of property leaving the estate.

[11] Debtor also asserts that the court should deny the Motion because Mr. Pearce allegedly comes to court with unclean hands. Debtor's Resp. at 6-8. This argument (which is of unclear legal relevance to begin with) is rejected for a lack of specific, non-conclusory allegations of bad-faith conduct. Although Debtor made several allegations of bad faith in support of his third-party complaint (*see* Answer (ECF No. 10) ¶¶ 32-44), he subsequently stipulated to dismissal of this claim, admitting that it was based on inaccurate information. *See* Stipulation to Allow Dismissal of Second Counterclaim (ECF No. 25).

Page 15 – OPINION

"[t]his is a state law matter and not a core function of the bankruptcy court." Answer (ECF No. 10) ¶ 27. Although "core function" is not a term of legal significance, it appears that Debtor is arguing that this is not a core *proceeding* for purposes of 28 U.S.C. § 157(b). If parties do not consent to entry of a final order or judgment in a non-core proceeding, this court submits proposed findings and recommendations for review and entry by the district court. Dist. Ct. L.R. 2100-11(c). However, this court must make the initial determination whether a proceeding is core or non-core. 28 U.S.C. § 157(b)(3). I conclude that this is a core matter, and Debtor's consent is not necessary for entry of a final order or judgment.

To begin, the Debtor's claim that this proceeding is non-core lacks merit because the only basis given for this assertion is that the dispute is "a state law matter." The role of state law can be a factor in determining whether a matter is core, but it is never dispositive. 28 U.S.C. § 157(b)(3) ("A determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law."); *Johnston Envtl. Corp. v. Knight (In re Goodman)*, 991 F.2d 613, 617 (9th Cir. 1993) ("A proceeding is not removed from the jurisdiction of the bankruptcy court solely because the resolution may be affected by state law.").

Congress has provided a non-exclusive list of core proceedings in 28 U.S.C. § 157(b)(2). I conclude that this proceeding is core under § 157(b)(2)(A). In so holding, I am mindful that the "catch-all" categories of §§ 157(b)(2)(A) and (O) must be narrowly construed. *Honigman v. Weitzman (In re Delorean Motor Co.)*, 155 B.R. 521, 525 (9th Cir. BAP 1993) (breadth of §§ 157(b)(2)(A) and (O) "must be tempered by the Supreme Court's decision in *Northern Pipeline*"). Nonetheless, after examining relevant authorities, I believe that the issues presented here are clearly matters concerning administration of the estate.

Plaintiff's complaint contains two causes of action. In withholding consent, Debtor only references the first claim, which asks for a declaratory judgment regarding whether Debtor dissociated as a result of his chapter 11 petition. Debtor thus seems to implicitly concede that the second claim (asking for a declaratory judgment on the § 365 issues) is within the court's core jurisdiction. For the sake of clarity, I hold that the second claim concerns administration of the estate, and is therefore a core matter under 28 U.S.C. § 157(b)(2)(A).

Turning to the first claim, Mr. Pearce asks for a determination that the bankruptcy estate lost certain rights under the Operating Agreements as a result of Debtor's bankruptcy filing. This claim thus asks the court to determine which of Debtor's property rights transferred to the estate; or, put another way, this is a dispute over what is property of the estate. Many courts have held that determination of whether assets are property of the estate is a core matter. *Bank of Los Angeles v. Official PACA Creditors' Comm. (In re Southland + Keystone)*, 132 B.R. 632, 638 (9th Cir. BAP 1991) ("Clearly, a determination of whether assets are property of the bankruptcy estate concerns administration of the estate."); *In re Wash. Mutual, Inc.*, 461 B.R. 200, 217 (Bankr. D. Del. 2011) (§ 1334(e) jurisdiction over property of the estate "includes jurisdiction to decide whether disputed property is, in fact, property of the estate"); *All Am. Laundry Serv. v. Ascher (In re Ascher)*, 128 B.R. 639, 643 (Bankr. N.D. Ill. 1991) ("When a debtor and its creditors assert interests in property asserted to be part of the estate, the bankruptcy court has core jurisdiction to adjudicate all of those interests."); *Chase Manhattan Bank v. Jacobs (In re Jacobs)*, 48 B.R. 570, 572 (Bankr. S.D. Cal. 1985) (similar holding).

Not only has this conclusion been endorsed by numerous bankruptcy courts, but I also believe it finds support in recent (i.e., post-*Stern*) pronouncements from the U.S. Supreme Court. Specifically, I would note the various opinions in *Wellness International Network v. Sharif*, 135 S. Ct. 1932 (2015). *Wellness International* concerned a dispute between the debtor and a creditor over whether certain purported trust property was actually property of the estate. *Id.* at 1940-1941. The Seventh Circuit held that the bankruptcy court lacked jurisdiction to enter a final judgment because the dispute was a so-called "*Stern* claim"[12] and the trustee of the alleged trust had not consented to entry of a judgment by the bankruptcy court. The majority of the Supreme Court expressly declined to decide whether the creditor's claim truly was a *Stern* claim, instead holding that the trustee had impliedly consented to the bankruptcy court's jurisdiction. *Id.* at 1942, n.7. But the Chief Justice, joined by Justices Scalia and Thomas, wrote separately, rejecting the majority's consent ruling and stressing that "[i]dentifying property that constitutes

---

[12] A *Stern* claim "is a claim that is 'core' under the statute but yet 'prohibited from proceeding in that way as a constitutional matter.'" *Wellness Int'l*, 135 S.Ct. at 1949 (Alito, J., concurring).

Page 17 – OPINION

the estate has long been a central feature of bankruptcy adjudication." *Id.* at 1952 (Roberts, C.J., dissenting).[13] Under the dissenters' view, 28 U.S.C. § 157(b), as informed by historical practice, grants bankruptcy courts the ability to enter final orders and judgments concerning what is property of the estate. *Id.* at 1954 (describing property-of-the estate disputes as "a narrow historical exception that permits a non-Article III adjudicator in certain bankruptcy proceedings").

The Court's opinion in *Wellness International* gives me no reason to think that the majority justices would have disagreed with the dissent's reasoning were the question squarely before the court. I therefore adopt the Chief Justice's reasoning in *Wellness International* and hold that the adjudication of Mr. Pearce's first claim for relief is a core matter within the scope of 28 U.S.C. § 157(b)(2)(A), and that I may enter a final order on the Motion notwithstanding Debtor's withholding of consent.

## IV. Conclusion

For the reasons explained above, I deny the Motion to the extent that Mr. Pearce seeks a ruling that: (1) Debtor dissociated upon the filing of his petition, (2) Debtor has rejected the Operating Agreements, and (3) Debtor has lost his rights to manage the businesses of the Subject LLCs. I grant the motion to the extent that Mr. Pearce seeks a ruling that Debtor cannot assume the Operating Agreements without Pearce's consent.[14] The court will enter an order granting the motion in part and denying the motion in part, consistent with this opinion.

---

[13] At times the Chief Justice's dissent almost reads as a concurrence. The key to understanding the dispute is focusing on how the different justices approached the question of whether the claims were covered by *Stern*. The majority did not reach that question, holding that the parties had impliedly consented to bankruptcy-court jurisdiction. The Chief Justice, recognizing the *general* bankruptcy jurisdiction over property of the estate, would have remanded the case so that the bankruptcy court could make the initial determination of whether the dispute was a *Stern* claim. 135 S. Ct. at 1953 (Roberts, C.J., dissenting).

[14] Although Mr. Pearce has succeeded in his argument that the Operating Agreements are governed by § 365(c), I would note that under § 365(c)(1)(B), Mr. Pearce may consent to the assumption of the Operating Agreements notwithstanding the LLC Act's restrictions on assignment. Of course, Mr. Pearce is free to withhold his consent for any or no reason, but he may want to carefully consider the hazards of forcing Debtor to reject the Operating Agreements. *See In re Henderson*, 245 B.R. 449, 453 (Bankr. S.D.N.Y. 2000) ("The effect of rejection is one of the great mysteries of bankruptcy law.").

Page 18 – OPINION